[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-15869

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 26, 2011
JOHN LEY
CLERK

D. C. Docket No. 09-20598-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOHN DOE,
a.k.a. Hagla,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 26, 2011)

Before BARKETT and MARCUS, Circuit Judges, and RESTANI,* Judge.

MARCUS, Circuit Judge:

_____

* Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation.

John Doe ("Doe")[1] appeals his convictions for aggravated identity theft, principally claiming the government did not produce sufficient evidence that Doe <u>knew</u> the name and social security number he used in applying for a United States passport belonged to an actual person. Doe also argues that a two-level obstruction-of-justice enhancement was erroneously applied to his sentence because the admittedly false statements he made during his pretrial services interview were not material, because he did not intend to obstruct justice, and because no finding was made that he had actually obstructed justice. Finally, Doe says, for the first time on appeal, that use of his pretrial services interview statements against him violates the Fifth Amendment because he had not yet been <u>Mirandized</u> when the statements were made.

After thorough review, we conclude that the evidence was sufficient to support Doe's convictions and that the district court properly applied the obstruction-of-justice enhancement to his sentence. Accordingly, we AFFIRM.

## I.

## A.

This case is about passport application fraud. Because of its importance to

---

[1] As of April 27, 2010, the date the government filed its initial brief, Doe had not yet been affirmatively identified. For this reason we continue to refer to the Appellant as "John Doe."

the resolution of this case, we begin by describing in some detail the components of a United States ("U.S.") passport application. To apply for an American passport, an applicant must submit: (1) a passport application form, (2) proof of U.S. citizenship, (3) proof of identity, (4) two recent color photographs, and (5) a fee. The application form and supporting documents must be submitted in person. A passport application form consists of two pages,[2] which are attached to a four-page instruction sheet. If born in the United States, the applicant can establish citizenship by submitting a previous U.S. passport or certified birth certificate. An applicant can establish identity by submitting a document, such as a driver's license, that contains both the applicant's signature and either a physical description or photograph of the applicant. The instruction sheet explains, however, that "[w]hen necessary, we may ask you to provide additional evidence to establish your identity."

The U.S. passport, either in book or card form, may be issued only "to U.S. citizens or non-citizen nationals." The second page contains this unambiguous

---

[2] The application form requires applicants to submit the following basic information: (1) name, (2) date of birth, (3) sex, (4) place of birth, (5) social security number, (6) mailing address, (7) contact phone number, (8) email address (optional), (9) whether the applicant has ever used a different name, (10) parents' information, (11) height, (12) hair color, (13) eye color, (14) occupation, (15) employer, (16) additional contact phone numbers, (17) permanent address, (18) emergency contact, (19) travel plans, (20) whether the applicant has ever been married, (21) whether the applicant has ever been issued a U.S. passport book, and (22) whether the applicant has ever been issued a U.S. passport card.

warning: "[f]alse statements made knowingly and willfully in passport applications, including affidavits or other documents submitted to support this application, are punishable by fine and/or imprisonment under the provisions of 18 USC 1001, 18 USC 1542, and/or 18 USC 1621," and that "[a]ll statements and documents are subject to verification."[3]  The instruction sheet directs the passport applicant to provide his social security number if he has one.  The form also explains that the State Department will provide the social security number to the Department of Treasury.  The instruction sheet warns the applicant that the social security number will also be used "in connection with debt collection" and that the number will be checked against "lists of persons ineligible or potentially ineligible to receive a U.S. passport."  Finally, the instruction sheet warns the applicant that the information he provides may be made available to other government agencies in order to assist the Department of State in reviewing an applicant as well as "for law enforcement and administrative purposes."

**B.**

On Saturday, June 27, 2009, Doe went to the Miami Passport Agency (a part of the United States Department of State Bureau of Consular Affairs) to apply for a United States passport.  Doe met with Adjudication Manager Rodolfo Rodriguez

---

[3] The top of the first page of the passport application form directs an applicant's attention to this warning: "Attention: see WARNING on page two of instructions."

4

("Rodriguez"), handing Rodriguez a completed passport application form, a U.S. Virgin Islands birth certificate, a Florida driver's license, and some photographs of himself. The application form, birth certificate, and driver's license were all in the name of "Laurn Daniel Lettsome" ("L.D.L."), a real person and a U.S. citizen, but the photographs were of Doe, not Lettsome. The social security number (ending in 3903), date of birth (September 2, 1983), place of birth (St. Thomas in the U.S. Virgin Islands), and mother's name (Mae) listed on Doe's application form also belonged to the real L.D.L. Rodriguez testified that the birth certificate Doe submitted looked genuine, but that he wondered why the driver's license had been issued so recently, on March 2, 2009. When Rodriguez asked Doe about the license's recent issuance, Doe did not offer an explanation. Noticing that Doe spoke with an accent, Rodriguez asked Doe where he had been raised. Doe explained that he had been raised in Jamaica, where he had lived with his grandmother. Rodriguez testified at trial that, during his twelve years working at the passport agency, he had become familiar with the accent of people from the U.S. Virgin Islands and that Doe's accent did not sound like a U.S. Virgin Islands accent.

Concerned about the bona fides of the application, Rodriguez asked Doe to

5

fill out a supplemental worksheet.[4] Doe asked Rodriguez why he was "giving him such a hard time since he was a U.S. citizen." Rodriguez explained to Doe that, although he, Doe, had established his citizenship through the U.S. Virgin Islands birth certificate, he had not yet established his identity.

Rodriguez noticed that Doe was having difficulty filling out the supplemental worksheet. When Doe handed the supplemental worksheet to Rodriguez, Rodriguez also noticed that the handwriting on the worksheet and on the passport application form were different. Although this raised a "red flag," Rodriguez did not mention the discrepancy to Doe. Rodriguez asked Doe how he had come to the United States from Jamaica. Doe explained that he had done so using a Jamaican I.D. and the U.S. Virgin Islands birth certificate. Rodriguez then asked Doe if he had the Jamaican I.D. with him; Doe replied that he had probably left it at home. Rodriguez told Doe that he needed to see the Jamaican I.D., asking him to bring it with him to the passport agency on Monday, June 29, along with any other documentation corroborating his name, date of birth, and place of birth. Doe said that he would bring these documents with him the following Monday, offering no sign that he intended to abandon his efforts to obtain a passport. Rodriguez returned the passport application form and supplemental worksheet to

---

[4] A supplemental worksheet is a five-page document that asks applicants to provide additional basic identifying and contact information.

6

Doe, and asked him to finish the worksheet and to bring it in with him on Monday.

Notably, two days later, on Monday, June 29, 2009, Doe returned to the Miami Passport Agency office. In addition to bringing his passport application form, supplemental worksheet, and two photos of himself, Doe also brought a U.S. Virgin Islands birth certificate, as proof of citizenship, and a Florida driver's license and a U.S. Virgin Islands driver's license, as proofs of identity.[5] The U.S. Virgin Islands driver's license, which had been issued on December 22, 2008, contained Laurn Daniel Lettsome's name and date of birth but displayed Doe's photo.

Upon entering the office, Doe saw Manager Rodriguez and waived at him. Rodriguez took the documents Doe had brought with him and handed them to Louis Cordoba ("Cordoba"), the most senior passport specialist in the office at the time. Cordoba took over the case. Cordoba observed that, during the time he spent with Doe, Doe appeared to be "a little bit nervous," and talked a lot. Doe complained that Rodriguez had given him a "hard time," having asked him to produce still more documents. Cordoba recorded the information from the birth certificate onto the passport application form, administered an oath to tell the truth, had Doe sign the application (which he did in Lettsome's name), collected the

---

[5] There is no indication that Doe brought the Jamaican I.D. with him.

7

$160 passport application fee, which Doe paid for in cash, and issued Doe a receipt. Cordoba explained that administering the oath involved asking Doe to raise his right hand while Cordoba asked him if he swore or affirmed "to the best of [his] belief that everything on the application is true to the best of [his] knowledge and that the photos are a true likeness of [himself]." Doe answered in the affirmative. Doe's application was scanned and entered into the passport office's computer system. Doe left the passport office and was scheduled to return two days later, on July 1, 2009, to pick up his passport. Doe left his passport application form, his supplemental worksheet, the U.S. Virgin Islands birth certificate, and photocopies of the two driver's licenses.

Because of suspected fraud, Doe's application was referred to the Miami Passport Agency's fraud office. Aura Arauz-Figueroa ("Arauz-Figueroa"), a fraud prevention manager, was charged with running a series of checks to determine whether Doe had submitted a fraudulent application. After running these checks, Arauz-Figueroa and the fraud office determined that Doe was very likely an imposter. Through her search, Arauz-Figueroa also discovered that, in 2006, someone had applied for a passport using L.D.L.'s name but had subsequently abandoned the application. The photograph that was submitted with the 2006 application was not of Doe. The fraud team referred Doe's application to the

8

Diplomatic Security Service -- the law enforcement branch of the Department of State -- for further inquiry.

On Tuesday, June 30, 2009, Juan Ramirez ("Ramirez"), a Special Agent at the Diplomatic Security Service, began investigating Doe's case. Ramirez ran a series of database checks based on the information Doe had provided in his application form and supplemental worksheet. These checks revealed that there were three addresses associated with L.D.L.'s name, date of birth, and social security number -- one in Ohio, one in Florida, and one in the U.S. Virgin Islands. The database checks also enabled Ramirez to identify a person named Joyce Lettsome ("J.L."), who shared L.D.L.'s last name and who Ramirez thought might be related to L.D.L. because they shared a similar address. Ramirez discovered J.L. had a U.S. passport and that she worked at a hospital in St. Thomas, in the U.S. Virgin Islands.

Ramirez called Joyce Lettsome, and learned that Laurn Daniel Lettsome was her nephew and that he was with her in the hospital at the time. While on the phone with Ramirez, J.L. asked L.D.L. whether he had sold his birth certificate, explaining to him that she was on the phone with an agent who told her that someone in the United States had stolen his identity. Ramirez faxed Doe's passport application and supporting documentation to J.L. so that she could verify

whether the passport applicant was related to her. Ramirez then spoke on the phone to the real Laurn Daniel Lettsome, who confirmed that the name, date of birth, and social security number listed on Doe's application were in fact his own. L.D.L. told Ramirez, however, that he had never applied for a U.S. passport, nor had he ever obtained a U.S. Virgin Islands driver's license. At Ramirez's request, Lettsome faxed the agent a statement memorializing their conversation and stating that he was the real L.D.L.

Ramirez then went to the Miami Passport Agency to wait for Doe, who was scheduled to pick up his passport that day (July 1, 2009). Some time after 2 pm, Doe arrived at the passport agency and proceeded to the will call window to retrieve his passport. Manager Arauz-Figueroa, who was also waiting for Doe's arrival, called him into an interview room, where Special Agent Ramirez and Special Agent Alexander Yu ("Yu") were waiting to interview him. Ramirez began by telling Doe that he and Yu were with the Department of State and that they were going to review Doe's passport application with him.

Ramirez showed Doe his application form and had Doe confirm that this was the application he had submitted. Ramirez walked Doe through each piece of identifying information he had supplied, asking him to confirm whether his name was Laurn Daniel Lettsome, his date of birth was September 2, 1983, and his social

10

security number ended in 3903 -- all of which Doe confirmed as his own information. Doe also confirmed that the signature on the application form was his.

Ramirez showed Doe a photo of J.L. and asked him if he knew who the person in the photo was, or if he knew her name. Doe responded that he did not. Ramirez showed Doe a photo of the person in Ohio who had applied for a passport using L.D.L.'s information and asked him if he knew this person. Again Doe replied in the negative. When Ramirez told Doe that this person had applied for a passport under L.D.L.'s name, Doe responded that this person may have stolen his identity. At that point, Ramirez identified himself as a Special Agent with the Diplomatic Security Service and informed Doe about the consequences of making any materially false statements. Doe nevertheless continued to maintain that he was Laurn Daniel Lettsome.

Ramirez then placed Doe under arrest and conducted a search incident to the arrest. Ramirez found the following items on Doe's person: (1) the U.S. Virgin Islands driver's license (with L.D.L.'s information but Doe's photo); (2) the Florida driver's license (with L.D.L.'s information but again containing Doe's photograph); (3) L.D.L.'s original social security card; (4) a Bank Atlantic debit card in L.D.L.'s name; (5) the passport payment receipt for $160 in L.D.L.'s name;

11

and (6) a cell phone that displayed the name, or nickname, "Hagla," on the home screen. Ramirez transported Doe to the office of Customs and Border Protection at the Miami International Airport, where Doe was fingerprinted. Doe's fingerprints were checked against a criminal records database, but, because no match was found, Doe could not be identified. Doe's fingerprints were submitted to the U.S. embassy in Jamaica, but the embassy's database search produced no matches, either.[6]

## C.

A criminal complaint against Doe was filed on July 2, 2009. On the morning of July 2, before his initial court appearance and before he was appointed counsel, Doe was interviewed by United States Probation Officer ("USPO") Suzanna Silva ("Silva"). Before the interview began, USPO Silva explained to Doe that he had a right to have his attorney present, that any information provided would be used for bond purposes, and that, if he provided any false information, it could be used against him to deny him bond. USPO Silva also told Doe that if there was a question he did not want to answer, she would prefer he not answer it rather than provide false information. Silva then asked Doe how his name

---

[6] Based on the information Doe provided to the U.S. Probation Office during his post-trial, presentence interview, no match was found in the U.S. Immigration and Customs Enforcement's records either.

12

appeared on his birth certificate, and Doe answered, "Laurn Daniel Lettsome."

During this interview, Doe also told Silva that his date of birth was September 2,

1983 (L.D.L.'s date of birth), and that his place of birth was St. Thomas, U.S.

Virgin Islands (L.D.L.'s place of birth).[7]  This information was then included in a

written pretrial services report, which was prepared for the magistrate judge in the

Southern District of Florida.

On the afternoon of July 2, Doe had an initial appearance before the

magistrate judge.  At the start of the hearing, the government asked the magistrate

judge, "to the extent that you put [Doe] under oath, [to] advise him that he is under

oath and potentially subject to perjury charges if he does not testify truthfully."

Before the oath was administered, the following colloquy ensued:

> THE COURT: Good afternoon, sir.  Before I ask you any questions, I do want to say that you have the right to remain silent in response to any one of my questions.  All right.  Anything you say in these proceedings may be used against you.  Do you understand?
>
> THE DEFENDANT: Yes.
>
> THE COURT: All right.  Can you give me your full name?

---

[7] In a post-trial, presentence interview with a USPO, Doe said that he "believe[d] he was born on May 2, 1983 in Kingston, Jamaica."

| | |
|---|---|
| THE DEFENDANT: | Do I have to give my real name? |
| THE COURT: | What was the last name? |
| THE DEFENDANT: | My full name is Rohan Brown. |
| THE COURT: | Juan Brown? |
| THE DEFENDANT: | Rohan Brown. |
| THE COURT: | Rohan Brown. Okay. . . .[8] |

Following the hearing, the magistrate judge appointed a Federal Public Defender to represent Doe, and ordered him temporarily detained without bond. A pretrial detention hearing was held on July 8; the magistrate judge ordered Doe to be detained without bond because he was a flight risk.

On July 16, 2009, "John Doe" a/k/a "Hagla" was charged by a federal grand jury sitting in the Southern District of Florida in a three-count indictment: one count for willfully and knowingly making a false statement in a passport application, in violation of 18 U.S.C. § 1542 (Count 1); and two counts for aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1) (Counts 2 and 3). Counts 2 and 3 charged Doe with, "during and in relation to a felony violation" of 18 U.S.C. § 1542, "knowingly possess[ing] and us[ing], without lawful authority, a

---

[8] As the government has noted, Doe may not even be "Rohan Brown." One of the phone numbers Doe provided on his passport application form and the address he listed as his emergency contact were found to be linked to a "Rojan Christopher Brown." When this individual's driver's license records were pulled, the photograph was not of Doe.

14

means of identification of another person" -- namely, L.D.L.'s name (Count 2) and social security number (Count 3).

Doe initially pled not guilty to all three counts. But on August 31, 2009, right before his trial was to begin, Doe pled guilty to Count 1. Doe went to trial on Counts 2 and 3 -- the aggravated identity theft counts.

At trial, the real Laurn Daniel Lettsome testified. He confirmed that the name, date of birth, place of birth, social security number, and mother's name that Doe had listed on his passport application were all his. L.D.L. said that he had not filled out the passport application Doe submitted on June 29, 2009, that he had not given anyone permission to do so in his name, that the signature on the application was not his, and that the photograph attached to that application was not of him. Moreover, L.D.L. testified that he had not given Doe permission to apply for a U.S. passport using either his name or social security number. L.D.L. explained that he did not know any of the references Doe had listed on his application -- such as the emergency contact, Charlie Williams, or the employer, Gary Jackson.

Lettsome testified that the birth certificate Doe had submitted was in fact his. When asked about the Florida driver's license and the U.S. Virgin Islands driver's license, L.D.L. testified that he did not have and never had a driver's license, either from Florida, the Virgin Islands, or from anywhere else. When shown the Florida

15

driver's license Doe had submitted along with his passport application and the U.S. Virgin Islands driver's license that Doe had on his person when he was searched, Lettsome said that neither license was his -- even though the name and date of birth on both licenses and the height of 68 inches on the U.S. Virgin Islands license matched his own. L.D.L. explained, however, that the photographs on both driver's licenses were not of him. L.D.L. also testified that, despite being in his name, the Bank Atlantic debit card found on Doe's person also did not belong to him. L.D.L. explained that he did not have a bank account with Bank Atlantic or, for that matter, with any other bank.

When asked how his birth certificate and social security card ended up with someone else, Laurn Daniel Lettsome recounted that, one or two years earlier, he had lost these documents while getting a ride from someone in St. Thomas. These documents were in his wallet, and he forgot his wallet in the car. L.D.L. testified that he had lost his documents "many times, many times," that he had these documents with him "at all times," but that he never gave these documents to anyone to use. L.D.L. explained that he did not know Doe, had never met him, and did not know how Doe ended up with his documents.

The government also called Mario Rallo ("Rallo"), the records custodian for the Florida Department of Highway Safety and Motor Vehicles, Division of

16

Driver's Licenses ("DMV"). Rallo described the process for obtaining a Florida driver's license and confirmed that this was the process in place in March 2009, when Doe applied for and obtained a Florida driver's license. Rallo testified that first-time driver's license applicants must go to a DMV office in person and must bring with them both a "primary document" and a "secondary document." A primary document, which is used to establish legal presence or proof of citizenship, can be a U.S. passport or a U.S. birth certificate. A secondary document can be a social security card, an out-of-state driver's license, or a baptismal certificate, among other things. When a driver's license applicant presents his primary document and secondary document to the driver's license examiner, the examiner checks these documents against the Florida Driver's License Information System ("FDLIS") database to determine whether the documents are authentic. The examiner enters the applicant's name into the FDLIS database, exactly as it appears on the primary document submitted, and the applicant's social security number. Because the FDLIS database is tied to the Social Security Administration's database, the DMV is able to verify whether the submitted social security number is real or fictitious. If the social security number is verified as real, the examiner can proceed with the driver's license application process. If, however, the number is not verified, the DMV will not allow the examiner to process the application as

17

that of a U.S. citizen or permanent resident.

Upon verification, the applicant is obliged to provide the examiner with proof of his address, which is also entered into the FDLIS system. A photograph is taken of the applicant. The applicant is then required to sign a signature pad and, in doing so, must attest that all the information he has provided is true and correct. The examiner will regularly ask the applicant whether he "swear[s] or affirm[s] that all the information [he] provided in th[e] application is true and correct." If the applicant answers affirmatively, he pays a fee and is issued a driver's license.

According to the Florida DMV's records, when Doe went to the Florida DMV on March 2, 2009, he presented the U.S. Virgin Islands birth certificate (with Lettsome's information) as his primary document, and Lettsome's social security card and the U.S. Virgin Islands driver's license (but again utilizing Doe's photo) as his secondary documents. Doe's social security number was successfully verified as real, and Doe was issued a Florida driver's license in L.D.L.'s name.

At the close of the evidence at trial, Doe moved for a judgment of acquittal, pursuant to Fed. R. Crim. P. 29, arguing, among other things, that there was insufficient evidence to show that he knew Laurn Daniel Lettsome was a real person. The district court, however, denied the motion, concluding that the government had presented sufficient evidence to send the question to the jury,

18

which ultimately found Doe guilty beyond a reasonable doubt of both counts.

Because of the false information Doe provided to USPO Silva during his pretrial services interview -- information included in a pretrial services report that was prepared for the magistrate judge and that was to be used at Doe's bond hearing -- the Presentence Investigation Report ("PSI") recommended that Doe's sentence be enhanced by two levels for obstruction of justice, pursuant to U.S.S.G. § 3C1.1.[9] The PSI stated that the inclusion of this false information in the pretrial services report "led to the probation officer providing written, inaccurate information to a magistrate judge and thus, impeding justice." According to the PSI, Doe gave USPO Silva this false information "in an attempt to secure bond and impede the investigation." Doe's base offense level of 8 was thus increased to 10. With an offense level of 10 and a criminal history category of I, Doe's Guidelines range was 6 to 12 months for Count 1. As for Counts 2 and 3, 18 U.S.C. § 1028A(a)(1) required that a mandatory two-year term of imprisonment be imposed, to run consecutive to any other term of imprisonment. Pursuant to U.S.S.G. § 2B1.6 cmt. n.1(B), however, these two two-year terms could, in the court's discretion, run concurrently with each other.

---

[9]Application Note 4(H) to U.S.S.G. § 3C1.1 gives as an example of the type of conduct to which this enhancement applies: "providing materially false information to a probation officer in respect to a presentence or other investigation for the court." U.S.S.G. § 3C1.1 cmt. n.4(H).

Doe objected to the PSI's recommendation that the obstruction-of-justice enhancement be imposed.  After considering Doe's objection and the government's response, the district court found that the enhancement was proper.  The court explained, "We rely on our Probation Office to give us accurate information, and they are an arm of the court; and so when they are deceived, we are deceived."

The district court sentenced Doe to a six month term of imprisonment on Count 1, and terms of twenty-four months' imprisonment on Counts 2 and 3, to run concurrently to each other but consecutive to the sentence in Count 1.  After the district court pronounced sentence, Doe again objected to the obstruction-of-justice enhancement.

## II.

### A.

We review <u>de novo</u> whether there is sufficient evidence to support a jury's verdict in a criminal trial.  <u>United States v. Maxwell</u>, 579 F.3d 1282, 1299 (11th Cir. 2009).  In so doing, we "view the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict."  <u>United States v. Robertson</u>, 493 F.3d 1322, 1329 (11th Cir. 2007) (internal quotation marks omitted).

"Evidence is sufficient to support a conviction if a reasonable trier of fact

could find that the evidence established guilt beyond a reasonable doubt." Maxwell, 579 F.3d at 1299 (internal quotation marks omitted). As long as a reasonable trier of fact could so find, "[t]he evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." Robertson, 493 F.3d at 1329 (internal quotation marks omitted); see also United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006) ("It is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt."); United States v. Mieres-Borges, 919 F.2d 652, 656 (11th Cir. 1990) ("It is not necessary for the government to disprove every reasonable hypothesis of innocence, as the jury is free to choose among reasonable constructions of the evidence." (internal quotation marks omitted)). In short, we must uphold Doe's conviction for aggravated identity theft "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Gomez-Castro, 605 F.3d 1245, 1248 (11th Cir. 2010) (internal quotation marks omitted); accord Mieres-Borges, 919 F.2d at 656.

"The test for sufficiency of evidence is identical regardless of whether the evidence is direct or circumstantial, and no distinction is to be made between the

weight given to either direct or circumstantial evidence." Mieres-Borges, 919 F.2d at 656-57 (internal quotation marks omitted). But, "[w]here the government relies on circumstantial evidence, reasonable inferences, and not mere speculation, must support the jury's verdict." United States v. Klopf, 423 F.3d 1228, 1236 (11th Cir. 2005) (internal quotation marks omitted).

**B.**

The aggravated identity theft statute provides, in relevant part, that

> [w]hoever, during and in relation to any felony violation enumerated in [18 U.S.C. § 1028A(c)], knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

18 U.S.C. § 1028A(a)(1).[10] A "means of identification" can be a name, social security number, date of birth, or driver's license number, among other things. Id. § 1028(d)(7). In Flores-Figueroa v. United States, 129 S. Ct. 1886 (2009), the Supreme Court clarified that this statute "requires the Government to show that the defendant knew that the means of identification at issue belonged to another person." Id. at 1894. In so holding, the Court abrogated our previous decision in United States v. Hurtado, 508 F.3d 603 (11th Cir. 2007) (per curiam), where a

---

[10] Doe's unchallenged conviction for willfully and knowingly making a false statement in a passport application, in violation of 18 U.S.C. § 1542, is one of the felony violations enumerated in 18 U.S.C. § 1028A(c). See 18 U.S.C. § 1028A(c)(7).

22

panel of this Court had held that, to violate § 1028A(a)(1), a defendant did <u>not</u> need to know that the means of identification belonged to another actual person. <u>Id.</u> at 609-10.  Therefore, in order to convict Doe of aggravated identity theft, the government had to prove that Doe <u>knew</u> the identity he was using belonged to a real person.[11]  Doe contends that the government failed to prove beyond a reasonable doubt that he knew that the means of identification he was using belonged to a real person.  This knowledge requirement is the only element of the aggravated identify theft convictions at issue.

In <u>Flores-Figueroa</u>, the Supreme Court offered several ways how, in "the classic case of identity theft," the knowledge element would be easy for the government to prove:

> For example, where a defendant has used another person's identification information to get access to that person's bank account, the Government can prove knowledge with little difficulty.  The same is true when the defendant has gone through someone else's trash to find discarded credit card and bank statements, or pretends to be from the victim's bank and requests personal identifying information.

<u>Flores-Figueroa</u>, 129 S. Ct. at 1893.  The list offered by the Supreme Court was not meant to be exhaustive.  <u>See</u> <u>Gomez-Castro</u>, 605 F.3d at 1248 ("[T]his list of

---

[11]  The district court properly instructed the jury on this point.  The district court told the jurors that, in order to find the defendant guilty of aggravated identity theft under 18 U.S.C. § 1028A(a)(1), they were required to find beyond a reasonable doubt "[t]hat the defendant knew that the means of identification at issue belonged to an actual person."

23

examples [offered by the Supreme Court in Flores-Figueroa] does not foreclose the possibility of proving knowledge in a more difficult case.").

In United States v. Holmes, 595 F.3d 1255 (11th Cir. 2010) (per curiam), cert. denied, 131 S. Ct. 1546 (2011), a panel of this Court affirmed a conviction for aggravated identity theft based on the circumstantial evidence offered by the government concerning the knowledge element of 18 U.S.C. § 1028A(a)(1). In particular, we found highly probative the evidence showing that, prior to the charged offenses, Holmes had been successful in obtaining a Florida identification card, a Florida driver's license, and a United States passport using the victim's personal information. 595 F.3d at 1258. We reasoned that "[a] reasonable jury also could have found that Holmes's willingness to subject the social security card repeatedly to government scrutiny established that she knew, all along, that the social security card belonged to a real person and was not a forgery." Id. We elaborated further, observing that the government need not demonstrate that Holmes had detailed knowledge of the verification processes to which she subjected the victim's personal information, because "a reasonable jury could have found that Holmes knew at least that the Florida and federal governments requested and sometimes retained for many weeks detailed personal information to verify the authenticity of that information." Id.; accord Gomez-Castro, 605 F.3d at

1249 ("In <u>Holmes</u>, we rejected the argument that the government had to prove that Holmes was aware of the rigorous verification processes used by the federal and state governments.").

Similarly, in <u>Gomez-Castro</u>, 605 F.3d 1245, a panel of this Court again affirmed a conviction for aggravated identity theft based on the circumstantial evidence presented by the government. We explained that "[b]oth the circumstances in which an offender obtained a victim's identity and the offender's later misuse of that identity can shed light on the offender's knowledge about that identity." <u>Id.</u> at 1248. Relying heavily on <u>Holmes</u>, we found that the circumstantial evidence presented by the government regarding Gomez-Castro's later misuse of the victim Collazo's identity supported Gomez-Castro's conviction. In particular, we highlighted the following evidence regarding Gomez-Castro's previous uses of Collazo's identity:

> Before she presented the passport for entry in 2008, Gomez-Castro had repeatedly and successfully tested the authenticity of the birth certificate and social security card: she used them to obtain a New York driver's license and benefit card, two credit cards, a bank card, and the United States passport used in this crime. This circumstantial evidence supports a finding that Gomez-Castro knew the Collazo identity belonged to a real person when she later presented the passport bearing that identity to the border officer.

<u>Id.</u> at 1249.

25

We also rejected Gomez-Castro's attempt to distinguish <u>Holmes</u> on the ground that, unlike in <u>Holmes</u>, the government did not present evidence of the verification processes used by state and federal governments. We reasoned that even absent the detailed evidence of the "rigorous verification processes used by the government for the issuance of licenses to drive and passports" presented by the government in <u>Holmes</u> -- and in this case -- "a rational trier of fact could have found that Gomez-Castro knew at least that the New York and federal governments obtained proof of an applicant's identity to verify that identity." <u>Id.</u> The government was not required to present any special proof on the point because "[t]hat knowledge can be inferred reasonably based on ordinary human experience for which no special proof is required; a trier of fact can rely on common sense." <u>Id.</u> (citing <u>United States v. Cruz-Valdez</u>, 773 F.2d 1541, 1546-47 (11th Cir. 1985) (en banc)). Based on <u>Holmes</u> and the circumstantial evidence that the government had presented regarding Gomez-Castro's numerous past successes in using Collazo's identifying information, we concluded that "a rational trier of fact could have found beyond a reasonable doubt that Gomez-Castro knew the identity belonged to a real person when she presented the passport to gain entry into the United States." <u>Id.</u> at 1250.

Holmes and Gomez-Castro stand for the unremarkable proposition that a

defendant's repeated and successful testing of the authenticity of a victim's identifying information prior to the crime at issue is powerful circumstantial evidence that the defendant knew the identifying information belonged to a real person as opposed to a fictitious one. Under this precedent, and considering the particular evidence presented by the government in this case, Doe's challenge to the sufficiency of the evidence fails. While it is true that, as Doe points out, the government did not present any direct evidence of Doe's knowledge, the same was true in Holmes and Gomez-Castro. See Gomez-Castro, 605 F.3d at 1249 ("Our decision in [Holmes] establishes that the government can rely on circumstantial evidence about an offender's misuse of a victim's identity to prove the offender knew the identity belonged to a real person." (emphasis added)). The circumstantial evidence that the government presented to the jury here was substantial, and virtually indistinguishable from the government's sufficient showings in Holmes and Gomez-Castro.

Perhaps most significant, Doe repeatedly and successfully tested the authenticity of Laurn Daniel Lettsome's identifying information prior to submitting the passport application to the United States Department of State. The government presented evidence that Doe used L.D.L.'s original birth certificate and social security card to obtain driver's licenses in two separate jurisdictions: first, from the

27

United States Virgin Islands, and then from the state of Florida (only two and a half months before applying for the passport). Moreover, Doe was also able to open a bank account and obtain a Bank Atlantic debit card using the same identifying information, most notably the name of Laurn Daniel Lettsome. At trial, the government presented detailed evidence of the verification processes involved in obtaining a Florida driver's license. When an applicant submits a name and social security number to the Florida DMV (as Doe did), the social security number is verified under the FDLIS database, which in turn is tied to the Social Security Administration's database, and is also checked against the name provided by the applicant. The ability to obtain a Florida driver's license with a given social security number is compelling evidence that the social security number is genuine, and belongs to a real person. While the government did not present direct evidence showing that Doe knew of the specific verification processes to which he was subjecting L.D.L's identifying information, our prior precedent makes clear that it was not required to do so, because a rational jury could have "inferred reasonably based on ordinary human experience" that "federal and state governments routinely obtain an applicant's identity to verify the authenticity of that identity." Gomez-Castro, 605 F.3d at 1249; accord Holmes, 595 F.3d at 1258. Indeed, drawing all reasonable inferences in favor of the government, as we must, a rational jury could

28

have concluded (as it did) that Doe knew L.D.L.'s identifying information was subject to a detailed verification process when he applied for a driver's license. Doe's successes in obtaining not one, but two different driver's licenses from two different jurisdictions, in addition to opening a bank account and obtaining a debit card from Bank Atlantic, were meaningful circumstantial indicia that Doe knew L.D.L's identifying information belonged to a real person.

Doe's attempts to distinguish Holmes and Gomez-Castro are unpersuasive. Doe emphasizes that in both of those cases, unlike this one, the offenders each successfully obtained a passport and used the victim's identifying information to obtain a line of credit. See Gomez-Castro, 605 F.3d at 1249; Holmes, 595 F.3d at 1257. But Doe's singular focus on particular misuses of identifying information present in those cases, but not in this one, misses the broader point that Doe, like the offenders in Gomez-Castro and Holmes, repeatedly and successfully subjected the identifying information at issue to verification, including government verification, and that a rational factfinder could have concluded that these repeated successes provided the requisite knowledge that the identifying information belonged to a real person.

Moreover, the circumstantial evidence presented by the government about knowledge in this case went far beyond Doe's past successes in using L.D.L.'s

identifying information. Doe's conduct and remarkable persistence during his protracted passport application process also provided strong circumstantial evidence of his state of mind. As an initial matter, the government presented detailed evidence regarding the passport application process. At the very top of the two page passport application, there is a statement: "Attention, see WARNING on page two of instructions." And page two of the four page instruction sheet unequivocally states that "[a]ll statements and documents are subject to verification." These instructions made it abundantly clear that the information the applicant provides will be turned over to government agencies for verification, including the Social Security Administration and Internal Revenue Service databases.

Despite these clear warnings, Doe's subsequent conduct during the application process could be taken to have shown unfaltering confidence in his ability to obtain a United States passport using L.D.L.'s identifying information. During Doe's first visit to the Miami Passport agency on June 27, 2009, he presented Adjudication Manager Rodriguez a U.S. Virgin Islands birth certificate and Florida driver's license with L.D.L.'s identifying information. Rodriguez asked Doe why his Florida driver's license was issued so recently and where he was raised, and ultimately asked Doe to fill out a supplemental worksheet. Doe did

not back down on account of increased scrutiny; instead he asked Rodriguez why he was "giving him such a hard time since he was a U.S. citizen." Moreover, when Rodriguez asked Doe to return to the passport agency two days later with additional documentation confirming his identity, Doe agreed to do so.

Showing no trepidation about the possibility that L.D.L.'s identifying information was not genuine and that the passport agency would discover this, Doe returned to the Miami Passport Agency on June 29, as Rodriguez had instructed. Notably, Rodriguez had expressed doubts about documents supporting Doe's application. Nevertheless, when Doe arrived, he waved at Rodriguez, and later complained to Senior Passport Specialist Cordoba that Rodriguez had given him a "hard time" on his first visit. After giving Cordoba his passport application and the supporting documentation, and after taking a verbal oath regarding the veracity of the application, Doe paid the application fee and was scheduled to return to the office still again, two days later, to pick up his passport. Doe left his application and the supporting documentation with L.D.L.'s identifying information at the passport agency, including the U.S. Virgin Islands birth certificate and photocopies of both the Virgin Islands and Florida driver's licenses.

Again showing no hesitation, Doe entered the Miami Passport Agency for a third time on July 1, 2009, at which point the events that followed led to Doe's

31

arrest. A rational jury could have concluded beyond a reasonable doubt that if Doe ever doubted for a moment that L.D.L.'s identifying information belonged to a real person, the increased scrutiny from Rodriguez on his first visit to the Miami Passport Agency would have given Doe great pause about continuing to pursue his passport application. Moreover, a rational jury could have reasonably concluded that Doe knew that the agency had several days -- between his June 27 first visit to the July 1 third visit -- to investigate and verify whether L.D.L.'s identifying information belonged to a real person. Doe himself believed from the outset that he was being given a hard time in the application process. Yet Doe returned twice to the Miami Passport Agency, even openly drawing the attention of Rodriguez on his first return visit. Taken together, the evidence reasonably presented to the jury a clear picture of Doe's unwavering confidence in the accuracy and legitimacy of L.D.L.'s identifying information. A rational jury, considering this clear picture on top of the other considerable circumstantial evidence presented by the government, had sufficient reason to find beyond a reasonable doubt that Doe knew L.D.L.'s identifying information belonged to a real person.

### III.

Doe also claims that the district court erred in applying a two-level sentence enhancement for obstruction of justice under U.S.S.G. § 3C1.1. Doe says that any

misstatements made during his interview with USPO officer Silva were immaterial, because they did not affect the investigation or prosecution of this case in any way, and because he abandoned his alias in his initial appearance before the magistrate judge. Doe further claims, without any support in the record, that he believed UPSO Silva was another federal law enforcement officer when she asked him his name for purposes of preparing the pretrial services report, that his conduct was analogous to providing a false statement to an officer upon arrest, and that therefore the government must show that Doe's misstatements "actually resulted in a significant hindrance to the investigation or prosecution of the instant offense." U.S.S.G. § 3C1.1 cmt. n.5. Finally, Doe asserts for the first time on appeal that, because a probation officer did not advise him of his Miranda rights before interviewing him, the use of the statements he made during that interview to support the obstruction-of-justice enhancement violated his Fifth Amendment due process rights. We are unpersuaded.

In reviewing the district court's imposition of an obstruction-of-justice sentencing enhancement, we review the district court's factual findings for clear error and we review its application of the factual findings to the sentencing guidelines de novo. United States v. Tampas, 493 F.3d 1291, 1303 (11th Cir. 2007); United States v. Massey, 443 F.3d 814, 818 (11th Cir. 2006). Moreover, we

33

review sentencing issues raised for the first time on appeal only for plain error.

United States v. Bonilla, 579 F.3d 1233, 1238 (11th Cir. 2009). Even if we

determine that there was plain error, "the decision to correct the forfeited error [is]

within the sound discretion of the court of appeals, and the court should not

exercise that discretion unless the error seriously affects the fairness, integrity or

public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725,

732 (1993) (internal quotation marks and alteration omitted).

We begin with the relevant portions of the sentencing guidelines. U.S.S.G.

§ 3C1.1 provides for a two-level sentence enhancement where

> (A) the defendant willfully obstructed or impeded, or attempted
> to obstruct or impede, the administration of justice with respect
> to the investigation, prosecution, or sentencing of the instant
> offense of conviction, and (B) the obstructive conduct related to
> (i) the defendant's offense of conviction and any relevant
> conduct; or (ii) a closely related offense.

In interpreting this guideline, we have said that "[t]he relevant question is whether

the obstructive conduct occurred during the course of the investigation,

prosecution, or sentencing" of the offense of conviction or a closely related

offense. United States v. Campa, 529 F.3d 980, 1016 (11th Cir. 2008).

There is no question that Doe's obstructive conduct occurred during the

investigation and prosecution of the aggravated identity theft offenses. The

application of the obstruction-of-justice enhancement to Doe's sentence was based

34

on his misstatements to Silva, a United States probation officer, during her interview of Doe for the purpose of preparing a pretrial services report for a magistrate judge. Specifically, Doe continued to assert that he was Laurn Daniel Lettsome, an American citizen from the U.S. Virgin Islands, and gave Silva L.D.L.'s name, date of birth, and place of birth instead of his own. Moreover, before the interview began, Silva informed Doe that any information Doe provided would be used for bond purposes, and that, if he provided any false information, it could be used against him to deny him bond. Silva included the information Doe provided in a written pretrial services report, which was prepared for the magistrate judge prior to Doe's detention hearing.

The commentary accompanying U.S.S.G. § 3C1.1 provides courts with further guidance on when to apply the enhancement in the form of a "non-exhaustive list of examples of the types of conduct to which this enhancement applies." U.S.S.G. § 3C1.1 cmt. n.4. The preparation of a pretrial services report falls within the plain language of U.S.S.G. § 3C1.1 cmt. n.4(H), which states that the enhancement applies when the offender "provid[es] materially false information to a probation officer in respect to a presentence or other investigation for the court." As the district court emphasized, "[w]e rely on our Probation Office to give us accurate information, and they are an arm of the court;

35

and so when they are deceived, we are deceived." In addition, other circuit courts have repeatedly recognized that providing false information to a probation officer or pretrial services officer is encompassed by what is now U.S.S.G. § 3C1.1 cmt. n.4(H). See, e.g., United States v. Bedolla-Zavala, 611 F.3d 392, 395 (7th Cir. 2010); United States v. Garcia, 69 F.3d 810, 815-16 (7th Cir. 1995); United States v. Restrepo, 53 F.3d 396, 397 (1st Cir. 1995) (per curiam).

At no point does Doe challenge the fact that he provided false identifying information to Silva. Doe claims only that the false statements to the probation officer were not "material," because they did not actually hinder or affect the magistrate judge's bond determination, and because Doe abandoned the use of L.D.L.'s name at his initial appearance before the magistrate judge. This argument is misplaced, and misstates the relevant inquiry. The commentary to the enhancement guideline defines "material" information as "information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 cmt. n.6 (emphasis added). This Court has noted that this threshold for materiality is "conspicuously low." United States v. Odedina, 980 F.2d 705, 707 (11th Cir. 1993) (per curiam) (quoting United States v. Dedeker, 961 F.2d 164, 167 (11th Cir. 1992)). It is beyond dispute that Doe's true identity and citizenship status were relevant to the magistrate judge's bond determination.

36

Moreover, at the hearing, Doe did not correct the false date and place of birth he had provided to Silva. As this Court has noted, "[t]he magistrate judge must consider, among other things, the family ties, financial resources, residence, past conduct, criminal history, record of appearance at court proceedings, and probationary status of the person before the magistrate judge in a detention hearing." Campa, 529 F.3d at 1016. "A false name, if believed, would tend to affect the magistrate judge's assessment of these factors." Id.; see also Bedolla-Zavala, 611 F.3d at 396 ("The relevant considerations are the kind of information provided and its tendency to influence the court, not the actual effect of a particular misstatement. Personal information is a highly relevant factor in determining whether a defendant should remain in custody or be granted bond, and thus is material . . . .").

Doe also claims that his conduct was analogous to providing a false statement to a law enforcement officer upon arrest, and therefore the government had to show that his conduct "significantly obstructed or impeded the official investigation or prosecution of the instant offense." U.S.S.G. § 3C1.1 cmt. n.4(G); see also id. cmt. n.5(A). But, as just described, Doe's conduct falls squarely within application note 4(H), which does not require a showing of an actual, significant obstruction or hindrance. Bedolla-Zavala, 611 F.3d at 396; Restrepo, 53 F.3d at

37

397; cf. Campa, 529 F.3d at 1016-17 (noting that under application note 4(F), which provides for an obstruction-of-justice enhancement when an offender provides materially false information to a judge or magistrate judge, an enhanced sentence "[is] appropriate whether or not a significant hindrance occurred").

Doe's final objection to the obstruction-of-justice enhancement is raised for the first time on appeal. Doe now claims that the application of the enhancement based on his false statements during his interview with USPO Silva violated his Fifth Amendment due process rights, because Silva did not Mirandize Doe before interviewing him for the purpose of preparing the pretrial services report.

We are not persuaded that Doe has demonstrated any error, much less the plain error that is required of sentencing issues raised for the first time on appeal. Silva's request for Doe's biographical information in preparing a pretrial services report was not an interrogation for Miranda purposes. Rather, Silva's questions fell within the well-established "routine booking exception" to Miranda's coverage for questions posed to the defendant "to secure the biographical data necessary to complete booking or pretrial services." Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (emphasis added) (internal quotation marks omitted); see also United States v. Sweeting, 933 F.2d 962, 965 (11th Cir. 1991) ("An officer's request for routine information for booking purposes is not an interrogation under Miranda, even

though that information turns out to be incriminating.") (internal quotation marks omitted); <u>United States v. Jackson</u>, 886 F.2d 838, 841 n.4 (7th Cir. 1989) (finding that "the fifth amendment was not implicated" by custodial statements made to probation officer, because a probation officer is not someone who "acts on behalf of the prosecution").

Accordingly, we AFFIRM Doe's convictions and sentence for aggravated identify theft under 18 U.S.C. § 1028A(a)(1).

BARKETT, Circuit Judge, specially concurring:

I concur, believing that <u>United States v. Gomez-Castro</u>, 605 F.3d 1245 (11th

Cir. 2010) and <u>United States v. Holmes</u>, 595 F.3d 1255 (11th Cir. 2010), <u>cert.</u>

<u>denied</u>, 131 S. Ct. 1546 (2011) dictate affirmance.