[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-10530

_____

D.C. Docket No. 1:13-cr-20298-JEM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DORA MOREIRA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 30, 2015)

Before HULL, and DUBINA, Circuit Judges and BOWEN,[*] District Judge.

PER CURIAM:

_____

* Honorable Dudley H. Bowen, Jr. United States District Judge for the Southern District
of Georgia, sitting by designation.

Appellant, Dora Moreira, appeals her convictions for various health care fraud offenses and her 235 month total sentence.  Following a review of the record, we affirm the convictions and total sentence.

## I.  BACKGROUND

### A.  *Background*

A grand jury returned a 12-count indictment charging Moreira, along with two co-defendants, with various Medicare fraud and money laundering violations. The indictment charged Moreira with conspiring to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count I); conspiring to defraud the United States and receive and pay health care kickbacks, in violation of 18 U.S.C. § 371 (Count II); paying kickbacks in connection with Medicare, in violation of 42 U.S.C. § 1320a-7(b)(2)(A) (Count III); and conspiring to launder, and laundering, money derived from the conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 2 and 1956(a)(1)(B)(i) and 1956(h) (Counts VII–XII).  The indictment also included a criminal forfeiture count.

Following a seven-day trial, the jury returned guilty verdicts against Moreira on all counts.  The probation officer prepared a pre-sentencing investigation report ("PSI") that calculated a total adjusted offense level of 38.  Moreira's criminal history score was zero.  This resulted in a guideline sentence range of 235 to 293 months.  Prior to sentencing, Moreira moved for a downward departure under 18

2

U.S.C. § 3553(b) and the United States Sentencing Guidelines ("USSG") § 5H1.6, arguing that a departure was warranted based on the extraordinary circumstances presented by her role as a single parent. The district court denied the motion. The district court adopted the PSI and sentenced Moreira to 235 months' imprisonment on Counts I, II, III, VII, and VIII–XII and imposed a term of three years' supervised release.

B. *Trial proceedings*

The trial record discloses the following facts. Moreira was the sole owner, administrator, and president of Anna Nursing Services, a home health agency certified as a Medicare provider. When signing an enrollment application as a Medicare provider of home health services covered under Part A, the provider represents that all statements in the application are true and accurate. In order to bill Medicare for home health services, the provider must have rendered the services to Medicare beneficiaries who need skilled services, are homebound, are under the care of a physician, and are under a plan of care that has been completed and signed by the physician.

In October 2012, Sandra Hurst informed the Federal Bureau of Investigation (FBI) that her husband, Frank Hurst, was involved in a Medicare fraud scheme with Moreira at Anna Nursing in Miami. Both Sandra and Frank were Medicare beneficiaries, and both received kickbacks for serving as patients of Anna Nursing.

3

Frank was also a patient recruiter for Anna Nursing, and Moreira would pay him $1,800 to $2,000 in cash per patient recruit. He sought out Medicare beneficiaries who agreed to provide and receive payment for their Medicare information in exchange for Anna Nursing to submit fraudulent claims for homebound health services to Medicare. After being contacted by the FBI, Frank agreed to participate in consensual recordings of his participation in the scheme.

Under the scheme, Moreira would direct one of the recruited clients to a doctor of her choosing. The doctor would give the client a prescription for home health care. An individual from Anna Nursing, usually Ivan Alejo, a nurse and administrator at Anna Nursing, would go to the client's home and have the client sign papers attesting to the fact that he had received home health services. In fact, the client did not receive such services and was not homebound. Following the conclusion of the alleged home health services, usually 30 days, someone from Anna Nursing would provide the client with a kickback of approximately $1,500. [R. DE226; 227; 228.] This scheme lasted for about two and one half years, until May 2013.

From 2008 until 2013, Miguel Jimenez was one of the owners and operators of Flores Home Health. He took orders for his patients to Moreira so that Anna Nursing could provide them with home health services. For the referrals, Moreira paid Jimenez $2,300 in cash per patient per 30-day cycle. In the first few months,

he referred about 30 patients to Moreira. These patients were not homebound and did not need therapy. [R. DE229.]

An acquaintance of Moreira, Orlando Torres, confessed to the FBI during an interview that he had laundered money for Moreira. Moreira would write checks on Anna Nursing's Bank of America account, and Torres would give her cash in the amount of the checks, less his ten percent fee. Torres owned several different corporations, Medley Consulting, Medley Marketing, OCGMT, All Your Service Needs, Act Now Services, Gusmagil, and Merline Consulting. [R. GEX9a-e, 12–21, 24e.] These companies did not provide any services to Anna Nursing. At the request of the FBI, Torres agreed to conduct consensual recordings of his meetings with Moreira when they exchanged checks and cash. [R. DE228–229.]

In May 2013, the FBI conducted a search of Anna Nursing and seized patient files and other business records. [R. DE227; GEX25a–m, 26–30.] Among the records were forms signed by patients that did not have any date or description of services provided, and other forms that had Anna Nursing listed as the provider but did not contain a doctor's signature. Normally, the doctor signs the form before the home health agency is designated. The FBI also discovered fax transmittal confirmations for the necessary forms that Anna Nursing completed and faxed to the doctor for a signature, rather than the doctor generating the documents as a result of a face-to-face encounter with the patient.

5

FBI Special Agent Michael Finnerty reviewed the Medicare claims records for Anna Nursing, as well as the bank records for Anna Nursing, Moreira, and her co-conspirators.  [R. DE228.]  Between July 2010 and April 2013, Medicare paid into Anna Nursing's bank accounts over $7 million.  These Medicare payments accounted for 97% of all of the deposits into Anna Nursing's bank accounts.  Of that amount, $6.5 million was paid on claims for home health care involving physical or occupational therapy, and $801,864 was paid on all other diagnoses.  [R. GEX24.]  Medicare paid to Anna Nursing $667,924.32 in claims for 36 Medicare beneficiaries who were clients of Frank Hurst.  From the account, a total of $447,381 was paid to eight companies owned by Torres.  From the Anna Nursing accounts, Moreira received a total of $1,533,072 in cash.

In her defense, Moreira presented numerous witnesses at trial.  Joaquin Pereira testified that he worked as a coder for Anna Nursing for approximately six months, and during that time, Moreira never asked him to change the information in the documents he was using for coding and never gave him any instructions to falsify the coding.  [R. DE230.]  Marimer Rensoli testified that she worked as a registered nurse for Anna Nursing and performed initial assessments for patients who had home health prescriptions from a doctor.  She stated that Moreira never instructed her to falsify assessments, and she was not aware of any Medicare fraud

6

at Anna Nursing.  She did admit, however, that she obtained patient signatures on several assessment forms that did not have any patient information provided.  [*Id*.]

Maritza Vila testified that while she was employed at Anna Nursing, she gave the nurses the packages they needed to sign up patients for home health care, followed up with nurses who did not timely turn in the documents, and prepared the payroll.  She did not suspect that anything fraudulent was occurring at Anna Nursing.  [R. DE220.]  Vincente Perez testified that he worked part-time at Anna Nursing, inputting data that dealt with patient care.  He knew both Ivan Alejo and Moreira, knew they were good friends, but did not know whether Alejo recruited patients for Anna Nursing.  [*Id.*]  Two other witnesses, Raymond Wright and Carmen Ortiz, provided irrelevant testimony.

Moreira testified and denied any knowing participation in a Medicare fraud scheme.  [R. DE220–221.]  She stated that she and Alejo had a personal as well as business relationship, and Alejo assumed the administrative duties when she was absent from Anna Nursing.  She claimed that Alejo was not a patient recruiter at her behest, and she did not know that he was not seeing the patients he said he was visiting.  She knew that Frank Hurst had referred his wife to Anna Nursing but did not know that he referred other patients.  She denied paying recruiters and denied any knowledge of payments from Alejo to Frank Hurst.  She admitted to treating patients from Flores Home Health but denied that she paid Jimenez any money for

the referral of those patients.   The prosecutor showed the video recordings of Moreira's meetings with Frank Hurst.  One recording showed Moreira giving an envelope to Frank Hurst and, when questioned about the recording and the contents of the envelope, she responded that she was unable to determine what was inside the envelope she gave him.

In response to the prosecutor's questions about the checks she gave to Torres, she said that the money was for an investment in a club.  She could not explain why the checks were written from the Anna Nursing account and made out to different companies.  She could not provide the name, location, or type of club in which she was investing. [R. DE231.]  She also did not know the names, locations, or activities of the companies to which she wrote the checks.  When presented with the recording from a meeting with Torres in which Moreira indicated that she needed the money to pay people, she stated that she engaged in the discussion about patient recruiting to play along with Torres so she could get her money.

## II.  ISSUES

1.  Whether sufficient evidence supports the jury's guilty verdicts.

2.  Whether the district court abused its discretion by striking Moreira's list of 75 witnesses and by limiting the introduction of defense evidence.

3.  Whether the district court erred by excluding evidence of Moreira's compliance with some Medicare rules and regulations.

4.  Whether the district court erred at Moreira's sentencing hearing because of the way in which the court conducted the colloquy regarding allocution.

### III.  STANDARDS OF REVIEW

This court reviews *de novo* whether there is sufficient evidence to support a guilty verdict in a criminal trial. *United States v. Doe*, 661 F.3d 550, 560 (11th Cir. 2011).

The district court has wide discretion in its evidentiary rulings. "Ordinarily, a district court's evidentiary rulings are reviewed for abuse of discretion." *United States v. Edouard*, 485 F.3d 1324, 1343 (11th Cir. 2007).  However, when the defendant fails to preserve a challenge to an evidentiary ruling by contemporaneously objecting, our review is for plain error. *Id.*

This court reviews for plain error a claim of the denial of the right of allocution when the defendant made no objection at sentencing. *United States v. Prouty*, 303 F.3d 1249, 1251 (11th Cir. 2002).  "Under the plain error standard, before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. McKinley*, 732 F.3d 1291, 1296 (11th Cir. 2013) (internal quotation marks omitted).  If these three conditions are satisfied, the court may exercise its

discretion to correct the error, "but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *United States v. Cotton*, 535 U.S. 625, 631, 122 S. Ct. 1781, 1785 (2002)).

## IV.  DISCUSSION

A.  *Sufficient evidence supports the verdicts*

Moreira argues that the Government did not present sufficient evidence of her knowing participation in a scheme to defraud Medicare and in laundering the proceeds of the unlawful scheme.  Our review of the record convinces us otherwise.

To sustain the Medicare fraud conspiracy conviction, the Government had to prove beyond a reasonable doubt that (1) a conspiracy existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it.  *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013).  The Government may prove these elements by circumstantial evidence because conspiracy is "predominantly mental in composition."  *Id.*  The Government does not have to show that the defendant knew all of the details of the conspiracy or participated in every aspect of the conspiracy.  *Id.*  Rather, the Government's burden is to prove "that the defendant knew of the essential nature of the conspiracy."  *Id.* (quoting *United States v. Miranda*, 425 F.3d 953, 959 (11th Cir. 2005)).

10

For the money laundering charge, the Government had to prove that an agreement between two or more persons to commit a money laundering offense existed, and the defendant knowingly and voluntarily participated in that agreement. *United States v. Broughton*, 689 F.3d 1260, 1280 (11th Cir. 2012). To sustain the conviction for paying kickbacks in connection with Medicare, the Government had to show that Moreira made payments of money to persons "in return for referring an individual to a person for the furnishing . . . of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a–7b(b)(1) and (2).

The Government presented sufficient evidence to support these convictions. The testimony, recordings, and documents seized by the FBI are sufficient proof that Moreira reached agreements with patients to sign for alleged home health therapy in return for a cash kickback. She instructed Frank Hurst to recruit Medicare beneficiaries as patients of Anna Nursing, and she paid him in cash for each of the recruits he obtained. Evidence showed that Moreira paid Jimenez for his patient referrals, and Torres testified that Moreira told him that she needed cash to pay her patients and patient recruiters. She paid doctors and clinics for providing prescriptions for home health services and retrieved the prescriptions for Anna Nursing to submit claims for the services to Medicare. There was more than sufficient evidence from which the jury could infer, beyond a reasonable doubt,

that Moreira was directly involved in the patient recruiting and payment of kickbacks so that Anna Nursing could submit fraudulent claims to Medicare.

Additionally, there was sufficient evidence to support the money laundering convictions. Torres testified that he received the checks from Moreira, written on the Anna Nursing bank account, and gave her cash in the amount of the checks less his ten percent fee. Alejo witnessed Torres bringing Moreira a bag of cash one time. Torres testified that he laundered between $10,000 and $15,000 per week for Moreira. Moreira's defense that she gave Torres the checks for an investment are nonsensical. She was unable to provide the name of the club in which she was investing, or its location, or its business, and she did not present any documentary evidence to substantiate any club investment.

In addition to the aforementioned evidence of guilt, Moreira elected to take the stand and to testify in her own defense. In this circuit, "when a defendant chooses to testify, [s]he runs the risk that if disbelieved the jury might conclude the opposite of h[er] testimony is true." *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) (internal quotation marks omitted). Where the Government has presented some corroborative evidence of guilt for the charged offenses, and the defendant takes the stand in her own defense, her testimony professing innocence may establish, by itself, the elements of the offense. *Id.* at 315. "This rule applies with special force where the elements to be proved for a conviction include highly

subjective elements: for example, the defendant's intent or knowledge." *Id.*; s*ee also United States v. Williams*, 390 F.3d 1319, 1325–26 (11th Cir. 2004).

The record is replete with evidence supporting Moreira's convictions. The jury was free to believe the Government's witnesses rather than Moreira's mythomania. When a defendant testifies, she runs the risk of bolstering the Government's case if the jury chooses not to believe her. The jury had the opportunity to listen to Moreira and judge her credibility and demeanor. It was free to choose among reasonable interpretations, and it did so. Accordingly, we conclude from the record that there was more than sufficient evidence to support Moreira's convictions.

B. *Striking Moreira's witness list was not abuse of discretion*

Moreira contends that the district court severely hampered her presentation of relevant evidence by striking her list of 75 witnesses. The district court has wide discretion in ruling on evidentiary issues as to relevance and materiality, and we will not disturb its rulings absent a clear showing of an abuse of discretion. Moreira fails to make such a showing.

Prior to the commencement of the trial, the parties agreed that the case would take three to four days to complete. Because of the agreed upon trial time, the district court found that Moreira's list of 75 witnesses was baseless and unrealistic. Even though defense counsel reduced the list of witnesses, the district

court commented that most of the remaining witnesses' testimony was not relevant. [R. DE 220: 51–52.] However, Moreira presented numerous witnesses in her defense, and she cannot show that the district court prevented her from presenting any relevant testimony. Hence, we conclude that the district court did not abuse its discretion in striking the list of 75 defense witnesses and having the defense reduce its number of witnesses.

C. *Excluding evidence of Medicare rules compliance was not erroneous*

Moreira argues that the district court abused its discretion by excluding evidence of her compliance with Medicare rules and regulations because this evidence supported her defense that she did not intend to defraud Medicare. Moreira makes this argument for the first time on appeal; thus, our review is for plain error. *Edouard*, 485 F.3d at 1343.

Generally, "[e]vidence of good conduct is not admissible to negate criminal intent." *United States v. Camejo*, 929 F.2d 610, 613 (11th Cir. 1991); s*ee also United States v. Ellisor*, 522 F.3d 1255, 1270–71 (11th Cir. 2008) (affirming the exclusion of evidence of defendant's legitimate business activities in order to negate evidence of his fraudulent intent). The Government did not charge and did not argue that there was no legitimate business conducted at Anna Nursing. Thus, evidence that some of the claims filed by Anna Nursing may have been for services legitimately provided to eligible patients without the payment of

14

kickbacks was irrelevant. Accordingly, we conclude that the district court did not err in excluding such evidence.

D. *There was no plain error at sentencing*

Moreira contends that the district court effectively deprived her of her right to allocute because it warned her that any statement she made at the sentencing hearing could be used later if there were a new trial after appeal. She did not object at sentencing. Thus, we review for plain error her claim of a denial of the right of allocution. *Prouty*, 303 F.3d at 1251; s*ee also United States v. Quintana*, 300 F.3d 1227, 1231–32 (11th Cir. 2002) (stating that review of a district court's denial of a defendant's right to allocute is for manifest injustice, which is equivalent to plain error review).

At sentencing, the district court had a discussion with Moreira's counsel concerning the lack of an interpreter at the sentencing because Moreira's native language was Spanish. [R. DE234, p.15–17.] An interpreter had been present during the trial, and counsel assumed that the interpreter would be present at the sentencing as well. Counsel acknowledged that Moreira understood English but communicated better in Spanish. The district court cautioned counsel that Moreira should be careful if she wanted to allocute in case she appealed and received a new trial because anything she said could be used at a retrial. The district court emphasized, however, that it was not trying to stop her from making any

15

statements, and it would listen to her speak on her behalf no matter how long it took.  Counsel consulted with Moreira, and she decided not to speak.

"Allocution is the right of the defendant to make a final plea on his own behalf to the sentencer before the imposition of sentence." *Prouty*, 303 F.3d at 1251.  This right is protected under the Federal Rules of Criminal Procedure.  *See* Fed. R. Crim. P. 32.  The rule provides that the court, prior to imposing sentence, must "address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence."  Fed. R. Crim. P. 32(i)(4)(A)(ii).  The district court failed to address Moreira personally before it sentenced her.  Thus, there was error, and it was plain.  *Prouty*, 303 F.3d at 1252.

Although the district court plainly erred by not addressing Moreira personally, regardless of whether its warning deprived her of the right to allocute, Moreira still has the burden of demonstrating that the error affected her substantial rights.  *See id.*  She cannot meet this burden because the district court sentenced her at the bottom of the sentencing guideline range.  "We have held that the denial of the right of allocution presumptively affects a defendant's substantial rights only where the possibility of a lower guidelines sentence exists." *United States v. Perez*, 661 F.3d 568, 583 (11th Cir. 2011); *see also Quintana*, 300 F.3d at 1231–32 (holding that denial of right to allocute was not prejudicial because district court sentenced defendant to low end of guideline range).

Moreira's guideline sentencing range was 235 to 293 months, and the district court sentenced her to 235 months, the lowest end of the sentencing guideline range.  Hence, she suffered no prejudice, and her substantial rights were not affected by the court's error.  Accordingly, she is entitled to no sentencing relief, and we affirm her sentence.

## V.  CONCLUSION

There was sufficient evidence to support the jury's guilty verdicts, and the district court did not abuse its discretion with regard to the evidentiary rulings. Moreira failed to demonstrate that the district court's sentencing error affected her substantial rights or that she was prejudiced by the error.

Thus, for the aforementioned reasons, we affirm Moreira's convictions and sentence.

**AFFIRMED**.