[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-13814

_____

D.C. Docket No. 8:17-cr-00373-CEH-JSS-2

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

YOEL GRAVERAN-PALACIOS,
NOEL GRAVERAN-PALACIOS,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(October 15, 2020)

Before MARTIN, ROSENBAUM, and TALLMAN,[*] Circuit Judges.

MARTIN, Circuit Judge:

In this consolidated appeal, twin brothers Yoel and Noel Graveran-Palacios appeal from their convictions and sentences for various counts of access device fraud, aggravated identity theft, and conspiracy to commit access device fraud. Yoel[1] challenges his convictions on two grounds, arguing: (1) there was insufficient evidence to support his aggravated identity theft conviction; and (2) the District Court plainly erred by admitting overview and summary testimony from a lead police investigator in the case. Both brothers challenge their sentences, saying the District Court was wrong to increase their offense levels based on victims for which they were not directly responsible. Noel also argues that the District Court erred in denying him a minor role reduction. After careful consideration, we affirm the District Court's holdings as to Yoel's convictions and Noel's sentence. However, we have concluded that the District Court plainly erred by failing to make findings of the actual loss amount attributable to Yoel, so we vacate Yoel's sentence and remand for resentencing.

## I.    BACKGROUND

### A. INDICTMENT, ARREST, AND TRIAL

---

[*] The Honorable Richard C. Tallman, Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

[1] Since the Appellants share a last name, we refer to them by their first names.

In July 2017, a federal grand jury in the Middle District of Florida charged both Yoel and Noel Graveran-Palacios with conspiracy to commit access device fraud and aggravated identity theft, in violation of 18 U.S.C. § 371. In addition, Noel was charged with six counts of access device fraud, in violation of 18 U.S.C. §§ 1029(a)(1) and 1029(b)(1), (2), and three counts of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A and 2. And Yoel was individually charged with one count of substantive access device fraud, in violation of 18 U.S.C. § 1029(a)(1), (2) and one count of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A and 2.

Both brothers pled not guilty and proceeded to trial. Evidence at trial included the results of an extensive investigation by Tampa Police and Hernando County Sheriff's detectives into Yoel, Noel, and coconspirators Lazaro Hernandez-Cabrales and Ricardo Romero-Mesa. The evidence at trial ultimately included testimony from Mr. Hernandez-Cabrales who cooperated with law enforcement.[2] The evidence showed that the four men worked together to produce fraudulent credit cards, make purchases using those cards, and return merchandise for cash. The men primarily retrieved account information and produced counterfeit cards by using skimmers. At least as to this conspiracy, skimmers are devices that attach

---

[2] In his testimony, Mr. Hernandez-Cabrales refers to Yoel and Noel as the "Habana twin" and the "Douglas twin." We gather Yoel is the "Habana twin" and Noel is the "Douglas twin."

3

to internal components of a gas station pump to capture information from credit cards used to buy gas.  Testimony showed these conspirators used the counterfeit cards to make purchases at stores including Home Depot, Target, Walgreens, and AutoZone.

As part of the investigation, searches were conducted of Mr. Hernandez-Cabrales's residence, Noel's residence and vehicle, and a storage room rented in the name of Noel's girlfriend.  These searches revealed hundreds of gift cards and credit cards; numerous receipts for purchases and returns of merchandise; high end purses and clothing; receipts for wire transfers to the Ukraine; a Square credit card reader;[3] electronic goods; and clothing identical to what Noel was seen wearing in surveillance footage at Target.  Police also seized four computers.  Upon searching those computers, investigators learned that one of them had been used to purchase at least 74 credit card numbers from a Ukrainian dark web site including some that were associated with a 2014 data breach from Home Depot.

At trial, neither Yoel nor Noel presented evidence in their defense.  Upon the close of evidence, each brother moved for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29.  The District Court denied their motions, and the jury convicted Yoel and Noel on all counts.

B. NOEL'S SENTENCING

---

[3] A Square credit card reader is used with an iPhone to swipe credit cards.

Noel's presentence investigation report ("PSR") stated that, over the course of the conspiracy, investigators recovered a total of 1,300 credit or debit cards and about 1,867 stolen credit card numbers. The PSR calculated the total intended loss amount for the entire conspiracy as $933,500. For Noel, the PSR listed fifteen financial institutions that collectively experienced losses of $20,652.88.

As to the access device fraud charges, the PSR assigned Noel a base offense level of 6, under Guidelines § 2B1.1(a)(2). It added 14 points to the offense level under Guidelines § 2B1.1(b)(1)(H), because the loss amount was more than $550,000 but less than $1,500,000. The PSR calculated the loss amount by multiplying the total number of recovered access devices, 1,867, by $500. This calculation is pursuant to Guidelines § 2B1.1(b)(1), cmt. n.3(F)(i) that provides, in a case involving counterfeit or unauthorized devices, the loss amount "shall be not less than $500 per access device."

The PSR also increased Noel's offense level by two because the offense involved ten or more victims, pursuant to Guidelines § 2B1.1(b)(2)(A)(i). It added another two-level increase pursuant to § 2B1.1(b)(10)(C) because the offense involved sophisticated means. It added a third two-level enhancement because the offense involved device-making equipment, under § 2B1.1(b)(11)(A). Finally, it added a fourth two-level upward adjustment as a punishment for Noel's obstruction of justice, under § 3C1.1, because he absconded while he was on bond

5

and a bench warrant had to be issued. These calculations led to a total offense level of 28.

For aggravated identity theft convictions, the statute requires a two-year minimum sentence, to be imposed consecutively to the sentence for the conspiracy and access device fraud charges. Based on a total offense level of 28 and a criminal history category of I, Noel's guideline imprisonment range was 78- to 97-months' imprisonment. The PSR also listed 15 banks as victims of the conspiracy, and said that restitution was owed to those banks in the total amount of $20,652.88.

Noel objected to the loss amount, arguing the amount should be $3,000 instead of $933,500. He argued there was no credible evidence that all the card numbers associated with the conspiracy should be attributed to him. He said he should be accountable only for the six credit cards he used, resulting in a total loss amount of $3,000. In the alternative, he argued that the most he should be held responsible for was the 75 credit card numbers found on Mr. Hernandez-Cabrales's computer. Fixing the number at 75 cards, Noel would be held responsible for a loss amount of only $37,500, which would result in a four-level, rather than 14-level, increase in his offense level. He objected to the PSR's failure to award him a minor role reduction, because he argued he was a "bit player" in the conspiracy who did not participate in the bulk of the work involved in getting and using the credit cards. He also objected to the increase in his offense level based on an

enhancement for ten-or-more victims, stating that only six accounts were related to his activity. Finally, he objected to Paragraph 27 of the PSR, which reported that Mr. Hernandez-Cabrales divulged that Noel installed the credit card skimmers on gas pumps throughout the Middle District of Florida, and then divided the stolen account numbers with Hernandez-Cabrales.

The District Court overruled Noel's objections. As to the loss amount, it held that the full amount was "reasonably foreseeable" based on the acts and omissions of others during the course of the conspiracy. As to the number of victims, the court found it appropriate to consider the number of victims involved in the entire conspiracy, rather than only those involved with the specific accounts related to Noel. And as to the minor-role reduction, the court observed there was no evidence that Noel was less culpable than any other participant in the conspiracy.

The court adopted the facts in the PSR, and sentenced Noel to 60-months' imprisonment for the conspiracy charge and 97-months' imprisonment for the access device fraud charges, to be served concurrently. It ordered 24-months' imprisonment for the aggravated identity theft charge, to be served consecutive to his 97-month sentence, and three years of supervised release. The court also ordered Noel to pay, jointly and severally with his co-defendants, a total of $20,652.88 in restitution to 15 different banks that were victims of the conspiracy.

7

C. YOEL'S SENTENCING

Yoel's PSR began with a base offense level of 6, under Guidelines § 2B1.1(a)(2). It added 14 points to Yoel's offense level based on the total intended loss amount of $933,300, under § 2B1.1(b)(1)(H). It added two more points under § 2B1.1(b)(2)(A)(i), based on its finding that the offense involved ten or more victims. It also added two points for the use of "sophisticated means," under § 2B1.1(b)(10)(C), and two more for use of device-making equipment, under § 2B1.1(b)(11)(A). Yoel also received an additional two-level enhancement based on his obstruction of justice. This resulted in a total offense level of 28 and a criminal history category of I for Yoel, which gave him a guideline range of 78- to 97-months' imprisonment.

Yoel filed no objections to the PSR and did not object to the PSR at sentencing. The District Court adopted the PSR's findings of fact and guideline calculations in full. It sentenced Yoel to 60-months' imprisonment for the conspiracy charge and 84-months' imprisonment for the substantive access device fraud charge, to be served concurrently. Yoel received the required 24-month consecutive sentence for the aggravated identity theft conviction. He also received a three-year term of supervised release. The court required Yoel to pay, jointly and severally with his co-defendants, a total of $20,652.88 in restitution to 15 different banks that it deemed to be victims of the conspiracy.

## II.    STANDARDS OF REVIEW

We review <u>de novo</u> whether there is sufficient evidence to support a jury verdict in a criminal trial, drawing all reasonable inferences and credibility evaluations in favor of the jury verdict.  <u>United States v. Doe</u>, 661 F.3d 550, 560 (11th Cir. 2011).

We review for clear error the district court's factual findings underlying a sentence.  <u>United States v. Rodriguez</u>, 732 F.3d 1299, 1305 (11th Cir. 2013).  This includes the calculation of the number of victims, <u>id.</u>, the loss resulting from the reasonably foreseeable acts of coconspirators in furtherance of a conspiracy, <u>United States v. Rodriguez</u>, 751 F.3d 1244, 1256 (11th Cir. 2014), and the determination of whether a defendant qualified for a minor-role reduction, <u>United States v. Rodriguez De Varon</u>, 175 F.3d 930, 937 (11th Cir. 1999) (en banc).

When a defendant fails to preserve an evidentiary ruling by contemporaneous objection, we review the admission of that evidence for plain error.  <u>United States v. Turner</u>, 474 F.3d 1265, 1275 (11th Cir. 2007).

## III.    YOEL'S APPEAL

Yoel raises three issues on appeal.  First, he argues there was insufficient evidence to convict him of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1).  Second, he argues the District Court committed plain error by permitting a law enforcement witness to present what he refers to as overview and

9

summary testimony.  Third, he argues the District Court committed plain error when it found that his crime had ten or more victims, and sentenced him more harshly as a result.  We address each in turn.

A. SUFFICIENCY OF THE EVIDENCE

Aggravated identity theft has four elements: the defendant (1) knowingly transferred, possessed, or used (2) the means of identification of another person (3) without lawful authority (4) during and in relation to a predicate act, including access device fraud.  18 U.S.C. § 1028A(a)(1); see also United States v. Pierre, 825 F.3d 1183, 1194 (11th Cir. 2016).  To convict Yoel of aggravated identity theft, the government was required to prove he "knew the identity he was using belonged to a real person."  Doe, 661 F.3d at 561.  Knowledge can be proved "with little difficulty" and by circumstantial evidence.  Id. (quoting Flores-Figueroa v. United States, 556 U.S. 646, 656, 129 S. Ct. 1886, 1893 (2009)); see also United States v. Gomez-Castro, 605 F.3d 1245, 1248 (11th Cir. 2010).

Yoel argues that the evidence at trial was not sufficient to show either that the means of identification used to commit the crime belonged to a real person or that Yoel knew it belonged to a real person.  Specifically, he argues that the government failed to prove that "K.P.," the identified victim of Yoel's aggravated identity theft, is a real person, as opposed to a fictitious person or a corporate

entity.  Drawing all reasonable inferences in favor of the jury verdict, this argument fails.

The evidence presented at trial showed that the account number at issue belonged to real people named Sharon and Kenneth Pearson, who were married to each other.  Yoel's argument that "K.P." is not a real person is based on his assertion that neither Kenneth nor Sharon Pearson testified at trial.  But in fact Sharon Pearson did testify at trial.  Ms. Pearson testified that in 2014 charges were made at Shell Oil to a Bank of America account she held jointly with her husband, that she did not authorize those charges, and that she had physical possession of her debit card at the time the charges were made.  Detective Sharla Canfield also testified that the card's true account holders were Sharon and Kenneth Pearson.  In combination, this evidence clearly supports a finding that the account number at issue in Yoel's aggravated identity theft charge belonged to a real person.

Yoel argues that, even assuming sufficient evidence to prove the account belonged to a real person, the government did not prove that Yoel knew, verified, or attempted to verify that Kenneth or Sharon Peterson were real persons.  Yoel is right that there is little evidence demonstrating he knew the card belonged to a real person.  Nevertheless, because we have concluded there was sufficient evidence to support Yoel's conviction under Pinkerton co-conspirator liability, we need not address the sufficiency of evidence of Yoel's personal knowledge.

11

Pinkerton v. United States, 328 U.S. 640, 66 S. Ct. 1180 (1946) provides

that "[e]ach party to a continuing conspiracy may be vicariously liable for

substantive criminal offenses committed by a co-conspirator during the course and

in the furtherance of the conspiracy, notwithstanding the party's non-participation

in the offenses or lack of knowledge thereof." United States v. Mothersill, 87 F.3d

1214, 1218 (11th Cir. 1996). Pinkerton liability applies "where the substantive

crime is also a goal of the conspiracy" and includes "reasonably foreseeable but

originally unintended substantive crimes." Id.

The District Court instructed the jury on Pinkerton liability. It explained that

if the jury found Yoel guilty of conspiracy, it could find him guilty "of any of the

crimes he is charged with . . . even if [he] did not personally participate in the

crime." To do so, the jury was instructed it had to find beyond a reasonable doubt

that (1) during the conspiracy a conspirator committed the additional crime to

further the conspiracy's purpose; (2) the defendant was a knowing and willful

member of the conspiracy when the crime was committed; and (3) it was

reasonably foreseeable that a co-conspirator would commit the crime. Mr.

Hernandez-Cabrales testified here that he was "getting credit cards from people

that were not mine and I was loading them and making purchases." testimony

supports the finding that he, who was one of Yoel's co-conspirators, knowingly

used the identities of real people to commit access device fraud. This meets the

12

elements of aggravated identity theft.  See 18 U.S.C. § 1028A(a)(1).  And there is

no meaningful dispute that Yoel was a knowing participant in the conspiracy at the

time of Mr. Hernandez-Cabrales's crimes or that using the identities of real people

was a reasonable consequence of the conspiracy.[4]  Under Pinkerton, this is

sufficient to support Yoel's conviction.

## B.  ADMISSION OF OVERVIEW AND SUMMARY TESTIMONY

Yoel argues that the District Court plainly erred in admitting what he

characterizes as the overview and summary testimony of Detective Canfield.  At

trial, Detective Canfield was the first witness and the last.  The Detective's

testimony covered the broad scope of the lengthy, multi-part investigation that led

to Yoel and Noel's indictments.  Through her, the government introduced a

number of summary exhibits.  Yoel argues that this overview testimony is

impermissible because it allows law enforcement officers to give lay opinion

testimony about the anticipated evidence in the case.  He further argues that

Detective Canfield's summary testimony went beyond the scope of Federal Rule of

Evidence 1006 because it amounted to a closing argument.  Because Yoel did not

---

[4] Because Yoel does not address Pinkerton liability on appeal, the issue is abandoned and provides an independent ground for affirming his conviction for aggravated identity theft.  See United States v. Ardley, 242 F.3d 989, 990 (11th Cir. 2001) (per curiam) ("[I]ssues and contentions not timely raised in the briefs are deemed abandoned.").

object to these admissions below, we review them for plain error.  Turner, 474 F.3d at 1275.  We find none.

### 1.  Overview testimony

The District Court did not plainly err when it admitted Detective Canfield's testimony.  "It is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it."  United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003) (per curiam).  The Supreme Court has not decided whether so-called overview testimony is admissible, and the topic comes up in the published decisions of this circuit only as dicta.  See United States v. Khan, 794 F.3d 1288, 1300 (11th Cir. 2015) (noting that "prosecutors should not permit investigators to give overview testimony" but clarifying that overview testimony "is not what happened" in that case (quotation marks omitted)); United States v. Ransfer, 749 F.3d 914, 927 n.14 (11th Cir. 2014) (acknowledging that other circuits have "raised serious concerns with overview witnesses" but not reaching the issue).  As a result, there can be no plain error.

### 2.  Summary testimony

Yoel's challenges to Detective Canfield's summary testimony also fail because any error was invited.  "[W]here the injection of allegedly inadmissible

evidence is attributable to the action of the defense, its introduction does not

constitute reversible error." United States v. Martinez, 604 F.2d 361, 366 (5th Cir.

1979) (quotation marks omitted).[5]  Defense counsel invites error when it

"affirmatively stipulate[s]" to the admission of evidence or "orally consent[s]" to

the alleged error.  United States v. Jernigan, 341 F.3d 1273, 1290 (11th Cir. 2003)

(quotation marks omitted).  Where the doctrine of invited error applies, "review is

waived even if plain error would result."  United States v. Frank, 599 F.3d 1221,

1240 (11th Cir. 2010).

Here, Yoel's defense counsel invited any error.  It is true that Yoel's counsel

initially objected to the admission of Detective Canfield's summary testimony.

However, counsel later clarified that her objection was limited to testimony

regarding identity and that she "[didn't] have a problem with [Canfield's] general

summary."  Because trial counsel affirmatively agreed to the admission of

Detective Canfield's summary testimony, any error was invited and no remedy is

available as a result.  See Jernigan, 341 F.3d at 1290 ("[A] criminal defendant may

not make an affirmative, apparently strategic decision at trial and then complain on

appeal that the result of that decision constitutes reversible error.").

C.  TEN-OR-MORE VICTIMS ENHANCEMENT

---

[5] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.  Id. at 1209.

Yoel challenges the application of a two-level increase for an offense involving ten or more victims, pursuant to Guidelines § 2B1.1(b)(2)(A)(I). Again here, Yoel did not object to this increase at sentencing. Therefore, we review this issue for plain error. United States v. Bonilla, 579 F.3d 1233, 1238 (11th Cir. 2009).

Our review of the record persuades us that the District Court plainly erred when it applied the ten-or-more victims enhancement to his sentence without supporting findings. Under § 2B1.1(b)(2)(A)(i), a victim is defined as "any person who sustained any part of the actual loss determined under subsection (b)(1)," with person including "individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies." USSG § 2B1.1, cmt. n.1. For purposes of the sentencing enhancement based on the number of victims, our Court has expressly established that "the number of victims is defined in relation to the loss calculation" and the district court "must make independent findings to support its calculation of loss." United States v. Foley, 508 F.3d 627, 633–34 (11th Cir. 2007).

For Yoel, the District Court made no factual findings about the actual loss suffered by the banks. Neither does his PSR include a list of victim banks or calculations of actual loss. The government points us to paragraph 38 of Yoel's PSR, arguing that it "identified 15 banks as victims who had sustained actual loss."

16

But it is simply not there. Paragraph 38 of Yoel's PSR identifies no banks or loss amounts. It appears the government is mistakenly referring us to paragraph 38 of Noel's PSR.

The sentencing court's general order of restitution in Yoel's case is not sufficient to meet this circuit's requirement that district courts make specific factual findings of the loss calculation.[6] Because Yoel's restitution order is not supported by findings of actual loss, it was likely improper. For a restitution order, "the district court must make specific factual findings of whether the victim suffered a loss and the amount of those <u>actual</u> losses." <u>United States v. Huff</u>, 609 F.3d 1240, 1249 (11th Cir. 2010). In the past, this Court has invalidated orders for which the district court simply adopted the PSR's recommendation as to loss amount and "did not make specific factual findings at the sentencing hearing as to how this amount was calculated." <u>Id.</u> The District Court here made no specific factual findings at Yoel's sentencing and indeed appears to have adopted the restitution amounts from the wrong PSR. The restitution order in Yoel's case fails to support the increase in his sentence based on the number of victims, because the District Court failed to make loss amount findings required by our precedent.

---

[6] Yoel did not challenge the restitution order entered in this case, so it will stand as entered. Nevertheless we address the restitution order briefly here because the court's failure to make findings about loss amounts also affects the number of victims attributed to Yoel.

17

This error affects Yoel's substantial rights. The victim calculation resulted in a two-level increase in Yoel's offense level—from 26 to 28. With an offense level of 26, Yoel's guideline range would have been 63- to 78-months' imprisonment. See USSG ch. 5, pt. A (Table). A 28 offense level produced a range of 78- to 97-months' imprisonment. See id. Where, as here, "the record is silent as to what the district court might have done had it considered the correct Guidelines range, the court's reliance on an incorrect range in most instances will suffice to show an effect on the defendant's substantial rights." Molina-Martinez v. United States, 578 U.S. __, 136 S. Ct. 1338, 1347 (2016); see also id. (holding that "[a]bsent unusual circumstances," defendants need not show more than application of an incorrect guideline to establish prejudice); Foley, 508 F.3d at 634–35 (vacating sentence where district court improperly calculated guideline range and the Court could not say "with fair assurance" that the district court would have imposed the same sentence had it known a different range applied (quotation marks omitted)). Because the improper application of the ten-or-more victims enhancement caused the District Court to rely on an incorrect guideline range, it was plain error. We therefore vacate Yoel's sentence and remand for resentencing.

18

# IV.    NOEL'S APPEAL

Noel does not challenge the jury verdict and appeals only his sentence.  He argues the District Court erred in calculating the loss amount and total number of victims and in declining to apply a reduction for his playing a minor role in the offense.

## A. LOSS AMOUNT AND NUMBER OF VICTIMS

We begin with Noel's argument that the District Court erred by holding him accountable for all 1,867 credit cards used in the conspiracy.  He claims he should be held responsible only for the use of six cards, because the evidence showed that only two cards were found in his home and there is no evidence that his involvement in the conspiracy went beyond the use of six cards.  Based on the use of six cards, Noel argues his sentence should be enhanced only for an intended loss amount of $3,000.  He argues as well that the two-level enhancement for a crime involving ten-or-more victims should not have been applied.

Under § 2B1.1(b)(1)(H), a 14-level enhancement applies when the loss amount is more than $550,000 but less than $1,500,000.  For purposes of § 2B1.1, "loss" is "the greater of actual or intended loss."  USSG § 2B1.1 cmt. n.3(A).  The Guidelines prescribe a minimum loss amount of $500 per access device for crimes involving "counterfeit" or "unauthorized" access devices, which includes credit cards or other means of account access that can be used to obtain money, goods, or

19

a transfer of funds.  See USSG § 2B1.1 cmt. n.3(F)(i); 18 U.S.C. § 1029(e)(1).

When calculating the loss amount and number of victims, the district court must

consider all relevant conduct.  United States v. Siegelman, 786 F.3d 1322, 1332

(11th Cir. 2015).  Where a case involves jointly undertaken criminal activity,

relevant conduct includes "all acts and omissions of others that were (i) within the

scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal

activity, and (iii) reasonably foreseeable in connection with that criminal activity."

USSG § 1B1.3(a)(1)(B).  To determine a defendant's liability for the acts of others

at sentencing, the district court "must first make individualized findings concerning

the scope of criminal activity undertaken by a particular defendant."  United States

v. Hunter, 323 F.3d 1314, 1319 (11th Cir. 2003) (quotation marks omitted).  Only

after making these individualized findings can the district court determine the

reasonable foreseeability of other criminal conduct.  Id.

　　　Our review of the record supports the District Court's holding that the full

loss amount attributed to Noel was the result of reasonably foreseeable acts of

others involved in the conspiracy.  Considering "the evidence at trial . . . that

[Noel] participated," the court found that the total loss amount was "reasonably

foreseeable based upon the acts and omissions of others in furtherance of the

jointly undertaken criminal activity."  The findings in Noel's PSR, which the

district court adopted, stated that Noel helped Mr. Romero-Mesa and Mr.

20

Hernandez-Cabrales steal prepaid cards; that Hernandez-Cabrales produced counterfeit cards for Noel; and that counterfeit credit cards embossed with Noel's name were found near Hernandez-Cabrales's computer during a search.  Evidence at trial also showed that Noel accompanied Yoel and Mr. Hernandez-Cabrales to purchase a credit card skimmer that was later installed on a gas pump.  Police later found a storage unit in the name of Noel's girlfriend containing electronic goods and clothing that appeared to have been acquired in the course of the conspiracy.

This evidence shows Noel's participation at several steps of the conspiracy and demonstrates that his involvement went further than simply using fraudulent credit cards.[7]  In particular, Noel's involvement in purchasing a card skimmer supports the conclusion that the full loss amount was reasonably foreseeable and within the scope of his participation in the conspiracy because he would, or should, have known that the card skimmer would be used to collect credit card information.  Far from leaving a "definite and firm conviction that a mistake has been committed" in calculating the loss for which Noel was liable, United States v. Campbell, 765 F.3d 1291, 1302 (11th Cir. 2014) (quotation marks omitted), the

---

[7] To the extent Noel challenges the credibility of trial witnesses whose testimony established the scope of his participation in the crime, the District Court did not err in crediting that testimony. We afford "great deference" to the District Court's credibility determinations, and Noel provides us with no reason to discredit any specific witnesses. United States v. Singh, 291 F.3d 756, 763 (11th Cir. 2002) (quotation marks omitted).

record reveals that Noel was directly involved in multiple, critical steps of the conspiracy, and the total loss amount was thus reasonably foreseeable to him.

Because we find no error in the District Court's calculation of the total loss amount, we also find no error in the court's imposition of a two-level enhancement for ten-or-more victims under § 2B1.1(b)(2)(A)(i).  Noel does not dispute that there were more than ten victims in the conspiracy and, unlike Yoel's PSR, Noel's PSR specifically lists 15 institutional victims and the actual loss amounts they experienced.  As a result, the District Court did not err when it lengthened Noel's sentence based on the number of victims and included those amounts in his restitution order.

## B. MINOR ROLE REDUCTION

Next, we address Noel's argument that the District Court improperly denied his motion for a "a minor participant" reduction pursuant to § 3B1.2(b).  The Guidelines provide for a two-level decrease in a defendant's offense level if he played a minor role in the conspiracy.  USSG § 3B1.2.  A "minor participant" is not one whose role is "minimal," but one who is less culpable than most other defendants in the conspiracy.  USSG § 3B1.2 cmt. n.5.  Two principles inform whether the adjustment is warranted.  First, the district court must "measure the defendant's role against the relevant conduct for which [he] has been held accountable" in calculating his base offense level.  Rodriguez, 175 F.3d at 940.

22

Second, the district court may also compare the defendant's culpability to that of other participants. Id. at 944. Minor participants are those who are "plainly among the least culpable of those involved in the conduct of a group." Id. (quoting USSG § 3B1.2, cmt. n.1) (quotation marks omitted). The decision about whether a defendant qualifies for a minor role adjustment is a finding of fact that we review for clear error. Id. at 934. As the proponent of the downward adjustment, Noel bears the burden of establishing his minor role by a preponderance of the evidence. Id.

Based on trial evidence and uncontested facts in the PSR, the District Court held that Noel's role "simply could not be described as minimal," especially considering (1) evidence that he assisted in obtaining and installing credit card skimming devices and (2) evidence that he used counterfeit credit cards at various retailers. This finding is in keeping with our review of the record. The evidence showed not only that Noel made purchases with fraudulent credit cards, but also that (1) he connected Mr. Hernandez-Cabrales with a person who sold credit card skimmers and went with Hernandez-Cabrales to get them; (2) Hernandez-Cabrales and Yoel shared a portion of the skimmed card numbers with Noel; and (3) a Square credit card reader was found at Noel's home. In light of this evidence, and the lack of other record evidence suggesting Noel played a minor role, the District

23

Court did not commit clear error by denying his motion for a minor role adjustment.

\* \* \*

For these reasons, we affirm the judgment of the District Court with respect to Yoel's convictions and Noel's sentence.  We vacate Yoel's sentence and remand for resentencing.

**AFFIRMED** in part, **VACATED** in part, and **REMANDED.**